hGAUDIN, J.
A unanimous 12-person jury in the 24th Judicial District Court found appellant Joseph Dickerson guilty of the second degree murder of Larry J. London. We affirm, finding no reversible error in Dickerson’s assignments of error. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence.
London was shot 10 times and killed on February 27, 1996 in Gretna, Louisiana. Two eyewitnesses identified Dickerson, who had left the murder scene in a rented automobile.
On appeal, Dickerson assigned 10 district court errors. He contends the trial judge erred:
(1) when he overruled defense objections to the state’s peremptive strikes of black prospective jurors from the panel without stating a permissible reason for striking them,
(2) when he allowed the state to refer during closing argument to a taped prior inconsistent statement by prosecution witness Corey Watkins,
(3) when he allowed the jury to hear a portion of the defendant’s recorded statement to a detective in response to continued questioning after he had asked to speak to a lawyer,
(4) when he admitted an identification of defendant by prosecution witness Watkins which resulted from a suggestive photographic lineup,
(5) when he admitted an identification of defendant by prosecution witness Adam Hankins which resulted from a suggestive photographic lineup,
| ¡>(6) when he refused to grant the defendant’s motion for a new trial based on the unavailability for trial of witnesses Marlin Dickerson and Calvin Perkins,
(7) when he refused to grant the defendant’s motion for a new trial based on the discovery of evidence, after trial, that prosecution witness Gladys Johnson committed perjury,
(8) when he was rendered ineffective assistance of counsel,
(9) when he did not allow a 24-hour sentencing delay after denying the defendant’s motion for new trial on June 17,1998, and
(10)when he permitted a conviction based on an invalid indictment which failed to charge an offense by omitting the elements.
*428 THE CRIME
On February 27, 1996, Detective Grey Thurman was notified at approximately 6:40 p.m. of the shooting death of the victim which occurred at 528 Commerce Street in Gretna. He arrived 10 minutes later. Prior to the detective’s arrival, Deputy Brent Coussou, a patrol deputy, received a 911 telephone call, and responded within two and one-half to three minutes. He secured the scene and saw no weapon in the immediate vicinity of the victim. Detective Thurman testified the victim and casings were located in the middle of the driveway. There were four casings around the body, and four casings near the back of a car. The casings came from a semiautomatic handgun.
Ron Ainsworth, a crime scene technician, photographed the scene and took measurements. He recovered the 9mm casings, one unknown projectile, an unknown copper jacket and unknown fragments. He did not look for any fingerprints. Detective Thurman explained that he did not request the casings be sent off for fingerprint analysis because in his 19 years of experience in law enforcement, he had never been successful in obtaining fingerprints from casings. He also felt the fingerprints were unnecessary since he had two eyewitnesses to the incident.
UMark Bone, a forensic investigator with the Coroner’s Office, testified he was present at the scene and that he was the person responsible for removing the victim’s personal effects. The victim did not possess a firearm.
Dr. Fraser Mackenzie, the pathologist with the Coroner’s Office who performed the autopsy, testified as an expert in the field of forensic pathology. Dr. Mackenzie stated the cause of death was multiple gunshot wounds to the body. The victim had ten entrance wounds to the body, four of which were fatal.
Dr. Mackenzie removed bullet pellets from the body, which he gave to a technician from the Sheriffs Office. He testified that the injuries to the back of the body were consistent with the victim’s back facing the source of the gunfire. A toxicology report on the victim revealed the absence of drugs or alcohol.
Detective Thurman received information that Hankins was present and witnessed the incident. He interviewed Hankins on February 28, 1996. Watkins was also identified as a witness. The detective interviewed Watkins on February 29, 1996. He recorded and transcribed the statements he took from these witnesses. As a result of these statements, Dickerson became the main suspect. Hankins and Watkins provided the detective with a description of the vehicle the suspect was driving. They described the vehicle as a fairly new mid-size blue car, which was either an Altima, or which was similar to an Altima. The detective presented a photographic lineup to Watkins and Hankins, which consisted of six photographs. Both identified Dickerson.
Detective Thurman obtained an arrest warrant for Dickerson. He attempted to locate the defendant at his last known address, 582 Commerce Street, but he was unsuccessful. Dickerson was later arrested and was detained in New Orleans, where Detective Thurman conducted an interview.
| ¿After being advised of his Miranda rights, Dickerson agreed to give a statement. He understood and waived the rights, and signed a waiver form which recited these rights.
Detective Thurman stated that Dickerson said that he owned an older model Cutlass for which he had an unusual blue interior built. The interior featured “Louisiana” in white leather. The car was stolen but never recovered.
A week before the shooting, Dickerson heard that this interior was in a car seen in the Commerce Street neighborhood. He obtained a gun, went to Commerce Street, where he viewed the car and then shot and killed London.
*429 Dickerson testified at trial he did not shoot the victim. Although he admitted giving a statement to the detective, he denied its accuracy.
ASSIGNMENT NO. 1
Dickerson contends in this assignment of error that the trial judge failed to demand that the prosecution provide race-neutral reasons before peremptorily challenging jurors Randy Whittington and Catherine Duffard in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and circumstances that raise an inference that the prosecuting attorney uses his peremptory challenge or challenges to exclude potential jurors because of race. If such a showing is made, the burden then shifts to the prosecution to articulate a race-neutral cause for the challenge or challenges.
Dickerson is black, as was the victim in this case. The state had accepted two black jurors before challenging Whitting-ton, a black employed as a security guard. When Whittington was challenged by the state, | .^Dickerson’s attorney stated: “I’m going to lodge a challenge that the prosecution is striking all of the blacks on the panel.”
This was an incorrect statement and did not, as mandated by Batson, establish a prima facie case of discrimination based on race.
When Duffard was offered as a juror, the state had used eight of its 12 allowed peremptory challenges. The prosecuting attorney chose to use one of the state’s remaining four challenges to strike Duf-fard. Dickerson’s counsel objected, saying that he wished to make the “same challenge” made after Whittington was excused by the state. The record does not indicate Duffard’s race, but Dickerson’s attorney said that she looked “kind of black to me.” The trial judge would not ask Duffard about her race but he asked Dickerson’s lawyer to make an inquiry. Dickerson’s attorney declined. In any event, the trial judge did not err in not requiring the prosecution to give a race-neutral explanation. There was no prior showing of a discriminatory pattern in the selection of this jury.
ASSIGNMENT NO. 2
Dickerson argues that the trial judge erroneously allowed the prosecutor to refer in his closing argument to the taped statement made by Watkins the day after the shooting.
In the taped statement, which was introduced into evidence along with a transcript, Watkins told Detective Thurman that he was “right on side of’ Dickerson when Dickerson fired six shots at an unarmed London. Watkins also picked Dickerson out of a photographic lineup. At trial, Watkins testified that he did not remember making the statement incriminating Dickerson.
Watkins’ credibility was at issue. His statement to Detective Thurman was properly placed in evidence and was an appropriate impeachment tool. |fiWhen the prosecuting attorney referred to the inconsistency between Watkins’ taped statement and his trial testimony, the defense did not object. LSA-C.Cr.P. art. 841 requires a contemporaneous objection before the matter can be considered on appeal. Nonetheless, our examination of this record showed no error in either the taking or use during trial of the statement or in the prosecutor’s referral to it during closing arguments.
ASSIGNMENT NO. 3
Dickerson contends here that the trial judge erred in allowing the jury to hear a portion of his statement made to the police after he said he wanted to “talk to my lawyer.” In making his statement, Dickerson made this request about three quarters into the statement; however, *430 questioning continued. The trial judge granted the defense’s motion to suppress all portions of Dickerson’s statement after he requested a lawyer.
During trial, the defense cross-examined Detective Thurman about Dickerson’s requesting an attorney. The prosecution objected, noting that the court had suppressed all evidence after Dickerson requested an attorney. The prosecution argued that there was no basis for the defense to delve into this evidence. Contending that the line of questioning concerned credibility issues, the defense insisted on continuing its questioning, trying to show that Dickerson had been coerced into saying what he did. The trial judge pointed out that defense counsel was “opening the door” for the state to ask additional questions on this issue. Later when the state attempted on re-direct examination to further question Detective Thurman about what he had said on cross-examination, defense counsel objected.
The transcript of Dickerson’s statement to Detective Thurman is nine pages long. In the beginning, Dickerson admitted that he had already signed a form waiving his constitutional rights; nonetheless, the detective 17again explained the rights to Dickerson, who states that he was willing to make a statement telling his side of the story and that there had been no promises, threats or coercion of any kind.
Dickerson went on to say that his Oldsmobile Cutlass had been stolen about five months previous. The car had been “fixed up” and had a new interior with distinctive leather patches “cut out to look like Louisiana.” Although the Cutlass was never recovered, Dickerson said, he “started hearing about” another automobile with an interior resembling the one he had installed in his auto. That was approximately a week before the shooting incident. Dickerson stated that after he examined the interior of the other car he “... approached the guy and asked him for my interior and he looked like he was going for his gun.” Dickerson sad he was “faster than him” and shot first. After seeing his Louisiana patches in the other vehicle, Dickerson said, he “got real mad” and that his “head was hurting hard.”
Detective Thurman then asked Dickerson who was in his car with him when he drove to the shooting scene. Dickerson did not want to answer this question, saying, “No, I want to talk to my lawyer.” The trial judge declared the remainder of the statement inadmissable.
At trial, Dickerson told the jury that he had been coerced. The record shows, however, that Miranda rights were fully explained and waived and that before asking for an attorney Dickerson had explained to that detective why and how he had fatally shot London. Dickerson’s statement and his later denial of the events described therein were before the jury, as was, of course, his credibility and that of the police officer and the other witnesses who testified. If the trial judge erred, the mistake was harmless considering the fact that Dickerson’s explanation of how and why he shot London was made after Miranda rights were clearly explained, twice, and then knowingly waived.
| sIn any event, once Dickerson argued that he had been coerced, the state had the right to rebut this evidence, LSA-C.E. art. 611(E).
ASSIGNMENTS 4 AND 5
In these assignments of error, Dickerson argues that the trial judge was wrong when he did not suppress identification of him, by Watkins and Davis. The jury, however, no doubt accepted credible testimony and evidence indicating that both Watkins and Davis knew Dickerson from the neighborhood and although it was nighttime, the group was under a street light which gave both Watkins and Davis the opportunity to see and identify Dickerson. Both Watkins and Davis picked Dickerson out of a photographic lineup shortly after the shooting.
*431 The trial judge did not see, nor do we, any likelihood of a misidentification.
ASSIGNMENTS 6 AND 7
Dickerson contends that the trial court erred in denying his motion for new trial because he could not call Marlin Dickerson because she was in the audience during the trial and had not been sequestered and, secondly, because Calvin Perkins was offshore and was unable to appear at trial.
Marlin Dickerson, according to appellant, would have challenged the testimony of Gladys Johnson, who said that the defendant had telephoned her long distance and admitted shooting London. The defense had fair notice that Johnson was going to testify for the state; consequently, it appears that Marlin Dickerson should have been sequestered in anticipation of being called as a witness.
Perkins, according to appellant, would have testified that he saw a black car drive away from the murder scene. Dickerson that evening was 18driving a blue car. Perkins was not subpoenaed and there was no motion to continue the trial because of this person’s unavailability.
In moving for a new trial, a convicted defendant must show that the new evidence was not discoverable prior to or during trial and that had the jury heard or seen the new evidence, the verdict could have been different. The trial judge has considerable discretion in this regard. We see no abuse of discretion, considering the weight of testimony and evidence pointing to Dickerson’s guilt.
ASSIGNMENT NO. 8
This assigned error is based on ineffectiveness of trial counsel. Such a claim is most appropriately addressed through an application for post conviction relief. See State v. Truitt, 500 So.2d 355 (La.1987), and State v. Brown, 742 So.2d 1051 (La.App. 5 Cir.1999).
Although this assignment could be considered now in the interest of judicial economy, we do not believe that the record is complete enough for such a determination. We will not, therefore, rule on this assignment of error.
ASSIGNMENT NO. 9
Defendant argues the trial judge failed to wait the mandatory period of 24 hours between the denial of his post-trial motions and the imposition of sentence as required by LSA-C.Cr.P. art. 873. After denying the motions, the trial judge asked defense counsel, “Are you ready for sentencing?” Defense counsel replied affirmatively. Any statutory delay, therefore, was effectively waived.
The trial judge could impose only one sentence, mandatory life imprisonment. There was no showing of any prejudice in this assignment of error.
I, ASSIGNMENT NO. 10
Here, Dickerson argues that the indictment was invalid. The indictment form, however, followed the specific short form authorized by LSA-C.Cr.P. art. 465 subd. A(32); furthermore, the record shows no complaint below on the insufficiency of the indictment form and there is no suggestion on appeal that Dickerson was prejudiced in preparing his defense.
DICKERSON’S BRIEF
In addition to a brief filed by Dickerson’s appellate court counsel, the defendant filed a pro se brief. His main contention was that he had been denied effective assistance of trial counsel. As previously stated, this issue was not addressed by this Court.
Although neither brief alleged any errors patent, the record shows that when Dickerson was sentenced on June 17, 1998, he was advised by the trial judge that he had three years from that date to file for post conviction relief. We cannot say that he has a shorter period in which to file for *432 post-conviction relief notwithstanding the recent amendment to LSA-C.Cr.P. art. 930.8, which lessened the post conviction relief time to two years.
AFFIRMED.