782 So.2d 1093 (2001)
STATE of Louisiana
v.
Rodney A. MASON, Jr.
No. 00-KA-1223.
Court of Appeal of Louisiana, Fifth Circuit.
January 30, 2001.
*1094 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Attorney for Appellant Rodney A. Mason, Jr.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana; Churita H. Hansell, Terry M. Boudreaux, Appellate Attorneys, Assistant District Attorneys; David P. Wolff, Felony Assistant District Attorney, Research and Appeals, Courthouse Annex, Gretna, LA, Attorneys for Appellee State of Louisiana.
Panel composed of Judges GOTHARD, CANNELLA and GAUDIN, Pro Tempore.
JAMES L. CANNELLA, Judge.
Defendant, Ronald A. Mason, Jr., appeals his conviction for second degree murder, a violation of La. R.S. 14:30.1 and sentence of life imprisonment. We affirm and remand.[1]
On January 26, 1998, the Defendant shot and killed Melissa DiGiovanni (DiGiovanni) while they were sitting in a car in the parking lot of the Elmwood Plantation Apartments on Veterans Blvd. The Defendant, age 43, and DiGiovanni, age 17, were engaged at the time of the homicide. Testimony at trial revealed they had a very tumultuous relationship.
The Defendant and DiGiovanni met through a mutual friend, Lawrence "Butch" Heller. They started dating and living together in 1996. Several friends of both the Defendant and DiGiovanni testified that they often argued. Tanna Heidelberg (Heidelberg), a friend of DiGiovanni, testified that on December 17, 1997 DiGiovanni called her crying. Heidelberg heard the Defendant screaming and yelling and she heard slapping and hitting noises. DiGiovanni ultimately called the police and the Defendant was arrested for aggravated assault and simple battery. During the 911 call, the Defendant can be heard saying, "If the cops come, you're dead. You're dead." The responding officer testified that he observed minor swelling and redness on DiGiovanni's thighs and forearms and that DiGiovanni stated that Defendant used a knife during the assault. Heidelberg further testified that although she had never seen the Defendant hit DiGiovanni, she had seen bruises on her and knew that on one occasion the Defendant kicked DiGiovanni.
During his testimony, the Defendant claimed that the incident on December 17, 1997 occurred when DiGiovanni returned home at 1:00 a.m. and he learned that she had been out looking at Christmas lights with a man named Carl. He stated that *1095 DiGiovanni slapped him and he slapped her back. He denied using a knife.
Heller, the Defendant's friend for 12 or 13 years, testified that he never saw the Defendant hit DiGiovanni but he had heard him threaten to kill her. Heller also testified that the Defendant was very jealous and did not let DiGiovanni have any friends. Heller explained that the Defendant accused DiGiovanni of having relations with every man to whom she talked. He believed that most of the Defendant's accusations were unfounded. However, he admitted that DiGiovanni may have kissed a guy named Carl.
Defendant testified that, on the night of the murder, he went to pick DiGiovanni up from Heidelberg's house at approximately 9:00 p.m. DiGiovanni drove since Defendant had been drinking and was feeling sick. On the way home, they started arguing about where she had been earlier that night. According to the Defendant, DiGiovanni told him that "she was with Carl and she f* * * *d him and `Tomorrow I'm going to f* * * David'." (R., p. 460). The Defendant told DiGiovanni to stop the car and to get out but she refused. He claims that he blacked out. He only remembers grabbing the gun from under the driver's seat.
The Defendant testified that he lost control upon hearing DiGiovanni comment on her sexual relations with other men. However, he also testified that he lost control thinking of all the bills which he owed and could not pay. He stated that he was mentally exhausted from working long hours and that his life had gone downhill since he had met DiGiovanni. He blamed her for his poor financial state and his depression. There was evidence that the Defendant had a long standing drinking problem. He also had players' cards for numerous casinos in the area.
Prior to picking up DiGiovanni that night, the Defendant noticed a phone number for David on DiGiovanni's calendar which reminded him of an incident that occurred three days earlier where he came home from work and found her on the phone with David. He and David exchanged heated words and the conversation ended with David threatening the Defendant by stating, "watch your back." The Defendant testified that, after getting off the phone, he asked DiGiovanni who David was and she responded he was just a friend. However, he noticed her calendar had David's birthday on it. Three days before the homicide, Defendant learned that DiGiovanni had some type of relationship with David. He found a note in her handwriting stating, "Melissa is leaving Allan on December 17, 1997, because I am going to live with David."
The engagement ring that the Defendant gave to DiGiovanni was found behind the passenger's side rear tire. Heidelberg testified that DiGiovanni was wearing the ring on the day of the homicide. She explained that every time the Defendant and DiGiovanni fought, he demanded his engagement ring back. She stated that DiGiovanni always gave the ring back. This was supported by Deputy Brandon Dutreix who testified that after the December 17, 1997 incident, DiGiovanni took off her engagement ring and left it in the apartment before moving out. There was also an incident on January 1, 1998 when the Defendant reported that DiGiovanni had stolen the engagement ring after she left the apartment with another man.
After he shot DiGiovanni, the Defendant went back to his apartment and called Heller, his mother, and "Mr. Rocky," another friend. According to Heller, the Defendant telephoned at 11:00 p.m. on the night of the homicide to see if he could *1096 arrange for some time off from work.[2] Defendant then told Heller that he shot DiGiovanni. Heller tried to convince the Defendant to call 911 but the Defendant refused and Heller called 911, after ending his call with the Defendant. At that time, Heller did not know if DiGiovanni was alive or dead.
Kerry Suhre (Suhre), a resident of the Elmwood Plantation Apartments, testified that between 10:00 and 11:00 p.m. on January 26, 1998, he heard arguing outside his apartment. He looked out of his sliding glass door and saw a man standing outside the passenger's side of a car arguing and yelling into the car.[3] He could not hear or understand what the man was yelling and did not see anything in the Defendant's hands. Suhre testified that he watched for about two to three minutes and then returned to his computer. Approximately ten minutes later, Suhre heard a "pop" noise and looked outside again. He saw the man look into the car and then walk away into the apartment breezeway. He did not know what caused the "pop" noise, but did not think it sounded like a gunshot. Suhre testified that the argument only stopped after he heard the "pop" sound. Thirty-five to 40 minutes later an ambulance arrived, after which Suhre went outside where he saw a girl slumped at the driver's side window of the car.
Another resident of the complex, Omar Gonzales (Gonzales), arrived home at approximately 11:15 p.m. He saw DiGiovanni's car parked with its lights on and a lady in the car who appeared to have passed out. He knocked on the window of the car and asked if she was okay. There was no response. Gonzales then noticed blood on the ground. He immediately called 911 and an ambulance arrived within two minutes.
The paramedic testified that DiGiovanni had been dead for approximately 15 to 30 minutes. The forensic pathologist stated that DiGiovanni was pregnant at the time and that she died of a gunshot wound to the head.
Several police officers arrived at the scene. Deputy Lonnie Senior, the arresting officer, testified that the Defendant confessed to shooting DiGiovanni immediately and voluntarily, while he was being handcuffed. He told the arresting officer, "She cheated on me with David. That's why I killed her." After being read his Miranda rights, the Defendant again confessed.[4] The officers later obtained a taped confession.
Deputy Senior and Sergeant Dennis Thorton, the interviewing officer, stated that the Defendant appeared to have been drinking, but did not appear highly intoxicated. They testified that the Defendant's demeanor was cooperative and agreeable, his speech was not slurred, he walked without stumbling, he was coherent and appeared to understand what was happening. Deputy Senior further stated that the Defendant was very upset and remorseful.
According to the ballistics expert, the gun used by the Defendant was a caliber.44 magnum. The expert testified that the gun had excellent safety features and would not fire if it fell or was dropped or slapped. Although the Defendant testified that he did not know much about guns, his *1097 friend, Heller, testified that guns were the Defendant's hobby.
On appeal, the Defendant asserts that the evidence was insufficient to support a verdict of guilty of second degree murder. He argues that he established by a preponderance of the evidence the mitigating factors of "sudden passion" and "heat of blood." The Defendant contends that Di-Giovanni's words to him that she had sex with another man and planned to have sex with yet a third man the next day was sufficient provocation to prove he acted in sudden passion or in the heat of blood. He maintains that the State failed to refute this evidence and, thus, he was entitled to a verdict of manslaughter rather than second degree murder.[5]
La. R.S. 14:30.1 provides in part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or ...
La. R.S. 14:31(A) defines manslaughter in part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed ...
The penalty for manslaughter is imprisonment at hard labor for not more than 40 years if the victim was over the age of ten years. La. R.S. 14:31(B).
"Sudden passion" and "heat of blood" distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors which may reduce the grade of the offense. State v. Lewis, 97-160 (La.App. 5th Cir.7/29/97), 698 So.2d 456, 458, writ denied, 97-2381 (La.3/27/98), 716 So.2d 881. In order to be entitled to the lesser verdict of manslaughter, the Defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id. When such proof has been introduced, a second degree murder verdict is inappropriate. State v. Lombard, 486 So.2d 106, 111 (La. 1986).
Whether sufficient provocation existed for the reduction of the grade of the offense to manslaughter is a question to be determined by the factfinder in the case. Lewis, 698 So.2d at 459. Furthermore, it is the role of the trial court to weigh the credibility of the witnesses. The appellate court should not second-guess those credibility determinations beyond the sufficiency evaluations under the standard of review required by Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).
Under Jackson v. Virginia, the evidence is viewed in the light most favorable to the prosecution and the question is whether any rational trier of fact could have found the Defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. Furthermore, in reviewing *1098 the provocation necessary for a manslaughter conviction, the court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Lombard, 486 So.2d at 111; State v. Thorne, 93-859 (La.App. 5th Cir.2/23/94), 633 So.2d 773, 777.
According to the evidence, the Defendant and DiGiovanni had a volatile relationship in which the Defendant was physically abusive. In addition, the Defendant had previously threatened to kill her. On the night of the homicide the Defendant and DiGiovanni argued during the ride home. Her comment that she intended to have sex with David came immediately before arriving at the apartment complex. However, three days before the homicide, the Defendant found DiGiovanni's note indicating that she had a relationship with David. Thus, her comments were not without foundation. The evidence also shows that DiGiovanni's sexual behavior was a frequent subject of contention between her and the Defendant and that it was not unusual for her to return the Defendant's ring during these fights. In addition, the Defendant testified that his poor financial condition and exhaustion, which he blamed on DiGiovanni rather than on his drinking and gambling, contributed to his loss of control.
The Defendant testified that during the argument he told DiGiovanni to stop the car and get out, but she refused. He claims that he blacked out prior to shooting her. However, Suhre heard the Defendant arguing with DiGiovanni for more than ten minutes before he heard the gunshot. In addition, the ballistics evidence shows that the gun had safety features that would have precluded it from firing if simply dropped or slapped during a blackout.
Based on the evidence, the jury could have concluded that the provocation was not sufficient to deprive an average person of his self control and cool reflection or that the killing was provoked by DiGiovanni's comments about David. The argument between the Defendant and DiGiovanni was no worse than their previous ones, the subject of the argument was not a new one, and she had, on several occasions in the past, returned the Defendant's ring after an argument. Nothing new occurred between the two people. On a previous occasion, he had threatened to kill her and had beaten her on other occasions. The Defendant was extremely jealous and would not allow her to have friends. Furthermore, Defendant admitted that he was frustrated over his inability to pay bills, which he blamed on her. Viewing the evidence in the light most favorable to the prosecution, we find that any trier-of-fact could have found the Defendant guilty beyond a reasonable doubt of both the elements of the crime and that the Defendant failed to prove the mitigatory factors by a preponderance of the evidence.

PATENT ERROR
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration *1099 in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337, 339 (La.1975); State v. Boudreaux, 95-153 (La.App. 5th Cir.9/20/95); 662 So.2d 22, 28.
After our review, we find that the trial judge failed to inform the Defendant of the prescriptive period for post-conviction relief as required by La.C.Cr.P. art. 930.8. At the time of the sentencing, the period was three years from the date the conviction and sentence becomes final. However, effective August 15, 1999, the article was amended to shorten the period to two years. See: 1999 La. Acts 1262.[6]
We held in State v. Boles, 99-662 (La. App. 5th Cir.11/10/99), 750 So.2d 1059, 1062, that the amendment should be applied retroactively and a defendant, who was not informed of the prescriptive period for post-conviction relief, should be informed that the prescriptive period is two years. Compare: State v. Dickerson, 99-353 (La.App. 5th Cir.1/28/00), 751 So.2d 425. In Boles, we stated that the application of the amended prescriptive period in a defendant's case would not violate expost facto prohibitions, as the article itself does not relate to an offense or its punishment. Boles, 750 So.2d at 1062. Therefore, we will hereby order the trial court within ten days of the rendering of this opinion to send written notice to the Defendant of the amended prescriptive period, to advise him of when the period begins to run, and to file written proof in the record that the Defendant received said notice.
Accordingly, we hereby order the trial court to send to the Defendant, within ten days of the rendering of this opinion, written notice of the amended prescriptive period for post-conviction relief and notice as to when the period begins to run. The trial judge is further ordered to file written proof in the record that the Defendant received the notice. The Defendant's conviction and sentence are hereby affirmed.
CONVICTION AND SENTENCE AFFIRMED; REMANDED.
NOTES
[1] On March 19, 1998 the Defendant was indicted by a grand jury of second degree murder. After a jury trial on August 11-13, 1998, he was found guilty as charged by a vote of 10 to 2. He was sentenced on August 20, 1998 to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
[2] Defendant and Heller worked together at the New Orleans Sewerage and Water Board.
[3] Suhre was unable to identify the Defendant in court as the man he saw that night. However, Suhre identified the Defendant from a photograph. He explained that the Defendant looked different in court since his hair color had changed and he had no longer had a beard.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The Defendant failed to file a post verdict judgment of acquittal challenging the sufficiency of the evidence pursuant to La.C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887 (La.1982).
[6] The amended article provides, in pertinent part:

A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
* * * * * *
(3) The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.