820 So.2d 604 (2002)
STATE of Louisiana
v.
Javar JOHNSON.
No. 01-KA-1362.
Court of Appeal of Louisiana, Fifth Circuit.
May 29, 2002.
Rehearing Denied July 19, 2002.
*605 William R. Campbell, Jr., New Orleans, LA, for Appellant/Defendant, Javar Johnson.
John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, LaPlace, LA, for Appellee/Plaintiff, State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and CLARENCE E. McMANUS.
JAMES L. CANNELLA, Judge.
Defendant, Javar Johnson, appeals from his conviction of second degree murder and his sentence to life in prison, without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm.
*606 On March 11, 1999, the St. John the Baptist Parish Grand Jury issued a bill of indictment charging the Defendant with second degree murder. The Defendant was arraigned on March 17, 1999 and pled not guilty. The Defendant was tried by a 12 person jury on September 19 and 20, 2000.
At trial, the following facts and testimony were presented. At about 6:15 p.m. on January 13, 1999, the victim, Dennis Mitchell (Mitchell), was conversing with his friends Ronnie (Ronnie) and Quincy (Quincy) Singleton and the Singletons' cousin, Mark, on West Fourteenth Street in Reserve. The young men stood near Eddie Joseph's (Joseph) residence, warming themselves around a fire burning in a trash barrel. Several other people were also there, including the Singletons' sister, Deadra Singleton (Deadra), and their mother, Joyce Singleton (Joyce). Mitchell's cousin, Danielle Williams (Williams), was standing on her back steps ten feet away from the gathering. The Defendant exited Joseph's house and approached the group. Ronnie testified that the Defendant listened as Mitchell described an incident which happened "a couple of days" earlier, in which Mitchell had fired a gun at the Defendant, Ronnie, Travis Smith, and others.
Deadra testified that she heard the Defendant say to Mitchell, "You want to fight? You want to fight?" Williams testified that the Defendant said to Mitchell, "What's up now, n* * * *r? You got it on your mind. You did all that s* *t." Williams further testified that Mitchell told the Defendant that he did not want to fight, and that he told the Defendant, "Man, I ain't got time for it." Deadra and Ronnie testified that the Defendant swung his fist at Mitchell and that Mitchell blocked the blow. Williams testified that she saw the Defendant hit Mitchell in the face with his fist. Deadra stated that the Defendant took a stick out of the barrel and hit Mitchell with it, knocking him to the ground. The Defendant then hit Mitchell a second time. Williams also saw the Defendant hit Mitchell twice with the stick, which she said was the size of a two-by-four. The Defendant dropped the stick and fled the scene on foot. Ronnie testified that Mitchell did not have a gun and that Mitchell did not strike the Defendant.
The Singletons carried Mitchell to his grandmother's house on West Fifteenth Street. Once there, they called police. Deputy Brian Bertrand of the St. John the Baptist Parish Sheriff's Office responded to the call. The victim was on the steps of a house on West Fifteenth Street. His nose was bleeding. Emergency medical personnel transported Mitchell to River Parishes Hospital. Joyce and Williams both testified that the Defendant returned to the neighborhood later that evening, asking whether the police had been there.
Deputy Bertrand interviewed some bystanders at the scene and was told that Mitchell had been hit in the head with a stick. Deadra told Deputy Bertrand that the Defendant was the one who hit Mitchell. Witnesses assisted the officer in locating the stick in a trash can on West Fourteenth Street. Deputy Bertrand took the weapon to Lieutenant Harry Troxlair, the officer responsible for collection of evidence. At that time, Lieutenant Troxlair was working an off-duty security detail at the hospital. Lieutenant Troxlair notified Deputy Bertrand that Mitchell had died from his injuries.
Dr. William Newman was accepted by the trial court as an expert in the field of pathology. He testified that he performed an autopsy on Mitchell's body. He found a laceration on the right rear portion of Mitchell's scalp. Beneath the laceration were several skull fractures. There was *607 also a subdural hematoma, an accumulation of blood between the dura (the covering of the brain) and the brain tissue. Dr. Newman testified that the cause of death was brain injury secondary to the skull fractures. Dr. Newman testified that a stick such as the one in evidence could have inflicted the victim's injuries. Although such an injury could result if the victim suffered a seizure and hit his head on a blunt object. Most falls, he opined, could not cause the damage that Mitchell sustained.
Detective Sergeant Royal Burke testified that the Defendant turned himself in to authorities. He was arrested and transported to the offices of the Criminal Investigations Division at 10:55 on the night of January 13, 1999. Detective Burke read the Defendant his rights. The Defendant waived his rights and agreed to answer Detective Burke's questions. The Defendant told Detective Burke that he approached Mitchell, Ronnie and Quincy. The Defendant asked Mitchell if it was he who had fired shots at him. Mitchell said that it was. The Defendant said that he hit Mitchell three times with his fist. Mitchell fell to the ground, hitting his head. Mitchell stood up and the Defendant asked him again if he was the one who had fired shots at him. Again Mitchell replied that he had. The Defendant said he punched Mitchell again. He then picked up a stick and struck Mitchell with it. Mitchell fell to the ground and again the Defendant hit him. Detective Burke testified that he did not record this interview.
Defense witness Virgil Craighead (Craighead) testified that he was with the Defendant at Joseph's house on January 13, 1999. Mitchell arrived at the door. The Defendant went outside with Ronnie and Quincy while Craighead stayed inside the house. Craighead was aware that Mitchell and the Defendant engaged in a fight, but he did not witness the altercation. Craighead went outside to see Mitchell lying on the ground, wounded. Craighead said that he, Ronnie and Quincy helped Mitchell to his grandmother's house. They called 911 from there.
The trial court admitted the prior sworn testimony of defense witness William Roussel (Roussel), who was deceased at the time of trial. Roussel testified that he was in the Defendant's front yard at the time of the fight. He stated that it was Mitchell who approached the Defendant. The Defendant asked Mitchell why he had shot at him and the two began arguing. At one point, Mitchell put his hand in the waistband of his pants. The Defendant immediately grabbed a tree branch from the barrel and hit Mitchell with it once. Mitchell fell to the ground.
Another defense witness, Travis Smith (Smith), testified that he was also at the scene of the incident. Smith testified that Mitchell initiated contact with the Defendant. The Defendant asked Mitchell why he had fired shots at him. Mitchell attempted to hit the Defendant and a fistfight ensued. Mitchell put his hands in his pockets as if he were going to pull out something. The Defendant picked up a stick and hit Mitchell. Smith testified that he had seen Mitchell shoot at the Defendant on an earlier occasion.
The Defendant's sister, Lakesha Johnson (Johnson), testified that on January 1, 1999, she saw Mitchell fire shots at the Defendant. Johnson testified that, although she reported the shooting incident to police at the time, they were slow to respond and were unable to locate Mitchell.
At the conclusion of trial, the jury returned a verdict of guilty as charged to second degree murder by a vote of ten to two. On September 27, 2000, the Defendant *608 filed a Motion for New Trial and a Motion for Post-Verdict Judgment of Acquittal. After a hearing on November 8, 2000, the trial judge denied both motions. The Defendant waived statutory delays and the trial court sentenced him to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The Defendant made an oral motion for appeal and assigns three errors.

ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error the Defendant argues that the evidence was constitutionally insufficient to support a conviction for the crime of second degree murder because the Defendant acted in self-defense.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5th Cir.6/30/99), 742 So.2d 604.
Second degree murder is defined, in pertinent part, by La. R.S. 14:30.1A(1) as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm...." Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. The issue of specific intent is a question of fact. State v. Saylor, 01-451, pp. 7-8 (La.App. 5th Cir.11/27/01), 802 So.2d 937, 941.
The Defendant does not deny that he inflicted the victim's injuries, or that the victim died as a result of those injuries. He argues instead that he acted in self-defense. Self-defense is defined in La. R.S. 14:20 as follows:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the state must prove, beyond a reasonable doubt, that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953, 956 (La.1986); State v. Sprinkle, 01-137, p. 16 (La.App. 5th Cir.10/17/01), 801 So.2d 1131, 1141; State v. Barnes, 98 932, p. 4 (La.App. 5th Cir.2/10/99), 729 So.2d 44, 46, writs denied, 99-1018 (La.9/17/99), 747 So.2d 1099, 01-0519 (La.10/12/01), 799 So.2d 499. The relevant inquiry on appeal is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. State v. Sprinkle, 01-137 at p. 16, 801 So.2d at 1141; State v. Barnes, 98-932 at p. 5, 729 So.2d at 46.
The determination of a defendant's culpability rests on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger. State v. Sprinkle, *609 supra; State v. Barnes, supra. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Barnes, supra.
Under La. R.S. 14:21, an aggressor cannot claim self-defense. The statute provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Based on the foregoing, we find that a rational trier-of-fact, viewing the evidence at trial in a light most favorable to the State, could have found beyond a reasonable doubt that the Defendant did not act in self-defense. Although the testimony of the numerous eyewitnesses varied, several key facts were undisputed at trial. First, the victim, Mitchell, fired shots at the Defendant and his companions days before the homicide. Second, the Defendant and Mitchell exchanged words about the shooting. Third, the Defendant hit Mitchell with a large stick, inflicting a serious wound to the victim's head, from which the victim died. Fourth, the victim did not have a weapon.
The Defendant argues that the earlier shooting incident, along with Mitchell's reputation for routinely carrying a gun, provided him a reasonable basis to believe his life was in imminent danger during his confrontation with Mitchell on January 13, and that he had to use deadly force to protect himself. However, the Defendant's argument is discredited by the testimony of all of the State's eyewitnesses, as well as by the statement that the Defendant gave to Detective Burke, that the Defendant instigated the confrontation on January 13, 1999.
The State showed in its case in chief that the victim was conversing with others when the Defendant approached and attempted to goad him into a fight. According to the State's witnesses, Mitchell even told the Defendant he did not wish to fight. Still the Defendant persisted. None of the State's witnesses testified that Mitchell ever fought back. Moreover, there was no testimony that Mitchell had a gun that night.
Defense witnesses Craighead and Smith testified that he saw Mitchell who approached the Defendant. A third defense witness, Wendell Jones, testified that he saw part of the fight, but did not see who started it, because the area was too dark. Craighead's and Smith's testimony contradicts the Defendant's own statement to Detective Burke.
The Defendant told Detective Burke that he approached Mitchell on the street and confronted him about the earlier shooting. When Mitchell attempted to explain why he had fired shots at him, the Defendant stated that he hit Mitchell three times with his fist, knocking him to the ground.[1] According to the Defendant, Mitchell tried unsuccessfully to block the Defendant's blows. After Mitchell had fallen, the Defendant hit him with the stick. The Defendant told Detective Burke that Mitchell did not have a weapon.
Defense witness Smith testified that he saw Mitchell put his hands into his pockets during the confrontation, as if he were *610 going to pull something out. However, the Defendant told Detective Burke that Mitchell already had his hands in his pockets when he (the Defendant) approached him. The evidence shows that the Defendant argued with Mitchell, and then hit him (or attempted to hit him) with his fists before picking up the stick. There is also evidence that the force that the Defendant used was excessive, even if he believed that the victim had a gun. According to eyewitness testimony, the Defendant knocked Mitchell to the ground with a blow of the stick, then he hit Mitchell again after the victim was apparently incapacitated.
When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Cazenave, 00-183, p. 14 (La.App. 5th Cir.10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Id.; State v. Styles, 96-897, p. 23 (La.App. 5th Cir.3/25/97), 692 So.2d 1222, 1233, writs denied, 97-1069 (La.10/13/97), 703 So.2d 609, 00-3460 (La.10/12/01), 799 So.2d 496. Obviously, from the verdict the jury found that the State's witnesses were more credible than the defense witnesses. Either they found that the Defendant was the aggressor or they did not believe that the Defendant reasonably believed that the use of violent force was necessary to prevent the victim from shooting him, or both. Based on the foregoing, we find that the Defendant's self-defense argument has no merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, the Defendant contends that the evidence was constitutionally insufficient to support a conviction for the crime of second degree murder because the Defendant acted in the heat of passion and upon provocation.
The Defendant argues that the State proved, at most, that he was guilty of manslaughter, a lesser included offense to second-degree murder. The manslaughter statute, La. R.S. 14:31, provides, in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
"Sudden passion" and "heat of blood" distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors which may reduce the grade of the offense. State v. Mason, 00-1223, p. 8 (La.App. 5th Cir.1/30/01), 782 So.2d 1093, 1098, writ denied, 01-0784 (La.11/16/01), 801 So.2d 1075. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id.; State v. McKinney, 99-395, p. 10 (La.App. 5th Cir.11/10/99), 749 So.2d 716, 721, writ denied, 00-0144 (La.9/29/00), 769 So.2d 550.
The Defendant concedes in brief that his blood "may have cooled" between the time *611 of the shooting incident and the confrontation on January 13. However, he argues that "Mitchell's verbal aggression and physical altercation" on the night of the murder served to rekindle his blood.
Only two witnesses, Craighead and Smith, testified that Mitchell approached the Defendant and set off the confrontation. The other fact witnesses either testified that they did not see who started the altercation between the Defendant and Mitchell, or that it was the Defendant who started the fight. The Defendant himself admitted to Detective Burke that it was he who approached Mitchell and threw the first punch. Two witnesses, Deadra and Williams, testified that the Defendant verbally provoked Mitchell, but that Mitchell said he did not want to fight. If the Defendant set off the altercation, and Mitchell resisted engaging in a fight, it is difficult to see how the Defendant was the party who was "provoked."
We find, from the evidence presented, that a rational trier-of-fact could have found specific intent to kill or inflict great bodily harm based on the Defendant's actions as described in the trial testimony. It is possible to infer from the circumstances that the Defendant held a grudge against Mitchell based on the earlier shooting incident and that he actively sought out the victim with the intention of injuring him in retaliation.
The Defendant cites State v. Nugent, 580 So.2d 1002 (La.App. 3rd Cir.1991), writ denied, 586 So.2d 539 (La.1991) in support of his argument. In that case, the defendant's conviction for second degree murder was set aside on appeal. The defendant in Nugent had agreed to allow his son to live in his travel trailer. Later that day, the defendant changed his mind. When his son arrived at the defendant's home, the defendant informed him he would not allow him to live in the trailer. The son became angry, and father and son argued. At one point the son held the defendant's head in his hand, and he slapped his father's face several times, causing coffee to spill on him. The son accused the defendant of leaving his wife to worry about the household bills. The defendant's wife intervened and told the son to leave the house. The son began to walk toward the door. The defendant picked up a gun and either told his son he would shoot him, or ordered him to get out of the house. The gun went off, killing the son.
On appeal, Nugent argued that the evidence at trial was insufficient to support his second degree murder conviction. He asserted that his son's physical assault and the intentional use of words, which would anger his father, were sufficient to deprive an average person of his self-control and cool reflection. The defendant contended that because the offense was committed in sudden passion or heat of blood, the state had proven, at most, that he was guilty of manslaughter.
The Third Circuit agreed with the defendant's argument, and reversed his conviction. They found that the jury's determination that the defendant did not act in the heat of blood or sudden passion, or that the average person's blood would have cooled, was clearly contrary to the evidence. The court cited the son's physical attack on his father, the argument over the trailer, and the son's comment that the defendant allowed his wife to take responsibility for the family's finances as provocation which would have deprived an average person of his self-control and cool reflection. State v. Nugent, 580 So.2d at 1005.
This case is distinguishable from Nugent. First, the victim in Nugent provoked the defendant's anger moments before the fatal shots were fired. Here, the *612 evidence does not show that there was any immediate provocation by the victim. In fact, the evidence tends to show that Mitchell resisted becoming involved in an altercation with the Defendant.
It is also noteworthy that the Nugent court was influenced by the jury, during deliberations, asking the trial judge to give them a copy of the definitions of second degree murder and manslaughter. The trial court refused, based on La.C.Cr.P. art. 808, which requires that when a jury requests additional charges, they must be administered orally in open court. The Third Circuit interpreted the jury's request as a sign that they were confused about the distinctions between second degree murder and manslaughter. The court felt that the defendant may have been prejudiced by the jury's confusion.
No such jury confusion took place in this case. During deliberations in this case, the jury sent the trial judge a written request for further explanation of the definitions of second degree murder and manslaughter. The trial judge called the jury back into the courtroom and extensively re-charged them on the law regarding both crimes. Upon concluding her explanation, the judge asked whether the jurors required any further instructions. There was no response. There is therefore little reason to believe that the same jury definition questions exist here as did in Nugent.
Therefore, considering the evidence at trial in the light most favorable to the State, we find that any rational trier of fact could have found sufficient evidence of the essential elements of second degree murder and that the proof of the mitigatory factors of manslaughter were lacking. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error, the Defendant argues that the trial court erred in allowing the State, mid-trial, to introduce an inculpatory statement after it had previously suppressed the statement pre-trial.
More specifically, the Defendant argues that the trial court erred in allowing testimony regarding the oral inculpatory statement he made to Detective Burke after his arrest. The Defendant contends that the statement was suppressed prior to trial and also that he was prejudiced by admission of the statement without prior notice by the State.
The Defendant filed a Motion to Suppress the Confession which was heard on June 3, 1999. At the hearing, Detective Burke testified that he first had contact with the Defendant at the criminal investigation division at 10:35 p.m. on January 13, 1999. The Defendant was, at that point, under arrest. Detective Burke stated that he advised the Defendant of his Miranda[2] rights, that he had the right to remain silent, that he had the right to an attorney, and that an attorney would be provided at no cost if he could not afford one. The officer also advised the Defendant that if he decided to answer questions without an attorney present, he had the right to stop the questioning at any time to request the advice of an attorney. The Defendant indicated that he understood his rights.
Detective Burke presented the Defendant with a form which listed his rights. The Defendant signed the form, indicating that he understood his rights, that he wished to waive them and answer questions without an attorney, and that no one had threatened him or promised him anything to induce him to make a statement.
*613 At 10:55 p.m., Detective Burke began to question the Defendant about his involvement in an altercation with Mitchell. Detective Burke did not record this interview. The Defendant said that Mitchell had fired shots at him about a week earlier. When he encountered Mitchell on the evening of January 13, he asked him about the shooting incident. Mitchell admitted that he had fired shots at the Defendant. The Defendant initially told Detective Burke that he punched Mitchell three times and that Mitchell fell to the ground and hit his head on the concrete. Detective Burke cautioned the Defendant that there were witnesses to the incident. The Defendant then stated that he had punched the victim once, hit him in the head with a stick, and then hit him a second time with the stick after he had fallen to the ground. This interview was not recorded.
At 11:23 p.m., Detective Burke asked the Defendant if he would give a recorded statement. The Defendant said that he would. Detective Burke advised the Defendant of his rights again, this time on tape. At that point the Defendant said that he did not want to give a recorded statement without a lawyer present. Detective Burke terminated that interview at 11:24 p.m.
Deputy Bertrand discovered that the Defendant was wanted on two warrants unrelated to this matter. Deputy Bertrand booked him on those warrants and advised him of his rights. Detective Burke was not present during the booking process. At 11:40 p.m., the Defendant advised Detective Burke that he wished to continue with the recorded interview. Again Detective Burke advised the Defendant of his rights and conducted a 15 minute recorded interview with him. Detective Burke testified that he did not make any promises or threats in order to induce the Defendant to make the recorded statement. At no time during this statement did the Defendant express a wish to discontinue the interview. At the conclusion of the hearing, the trial court took the matter under advisement, giving the parties time in which to file memoranda.
On August 19, 1999, the trial judge issued a written judgment, granting the motion to suppress. Specifically, the judge stated that the law required the officer to discontinue questioning once the Defendant had requested an attorney. Moreover, she felt that the Defendant's arrest on unrelated warrants influenced his decision to give a recorded statement without counsel only a few minutes after having requested an attorney.
At trial based on the earlier ruling the defense objected when the State attempted to question Detective Burke regarding the first, non-recorded statement, on grounds that the trial court had ordered it suppressed. The trial judge at first sustained the objection, ruling that her written judgment included suppression of the oral statement. The prosecution later asked the judge to clarify her judgment, arguing that it appeared to apply only to the recorded statement. After reviewing her written judgment again, the trial court ruled that the suppression only applied to the recorded statement and that the initial oral statement was admissible. Defense counsel objected.
The Defendant makes two arguments. First, he was prejudiced by the trial court's ruling admitting his first statement because he believed the written judgment granted the motion to suppress as to all statements. Second, the trial court erred in allowing admission of the statement because the State did not provide proper pre-trial notice as required by La.C.Cr.P. *614 art. 768.[3] As a result of these errors by the trial court, the Defendant claims that he was unfairly "surprised" at trial.
We find no error in the trial court ruling. First, the trial judge, in her written judgment, clearly granted the Defendant's motion to suppress only as to the recorded statement. There is no mention in the judgment of the statement that was not recorded. Further, the reasoning for the ruling, as provided by the trial court, was that the police erred in questioning the Defendant after he had requested counsel. The trial court judgment and reasons said nothing about the oral statement made before the Defendant requested counsel. Thus, it is clear that the trial court did not consider the first statement at all during the motion to suppress hearing. Further, reviewing the motion to suppress and the memoranda in support thereon, we find that the Defendant did not request a ruling on the suppression of the initial oral statement prior to trial.
Next, the Defendant argues that because the State did not provide a pre-trial notice, under La.C.Cr.P. art. 768, the trial court erred in allowing reference to the Defendant's oral statement. We disagree.
The purpose behind the notice requirement in Article 768 is to give the Defendant fair opportunity to meet the issue and to allow the Defendant adequate time to prepare his defense in light of the inculpatory statement. State v. Billiot, 421 So.2d 864 (La.1982); State v. Hayes, 98-485, pp. 11-12 (La.App. 5th Cir. 11/25/98), 726 So.2d 39, 44, writ denied, 99-0055 (La.5/7/99), 741 So.2d 29. If the Defendant had actual notice through discovery of the state's intent to use the statement, he is not prejudiced by the state's failure to provide written notice. State v. Williams, 416 So.2d 914 (La.1982); State v. Hayes, 98-485 at p. 12, 726 So.2d at 44.
In the instant case, the Defendant was fully aware of the oral statement that the Defendant made to Detective Burke. At the suppression hearing more than a year before trial, Detective Burke testified and gave the details surrounding the oral statement. See, State v. Hayes, supra. Therefore, we find no merit in the Defendant's argument that he was "surprised" by the admission of the oral statement at trial. Further, we note that defense counsel did not request a recess or continuance to prepare a defense to the statement. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Appellant requests, pursuant to La. C.Cr.P. art. 920, a review of the record for errors patent, that is, any error discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. We have reviewed the record for any errors patent on the face of the record and have found none.
Accordingly, for the reasons stated above, we affirm the Defendant's conviction for second degree murder and his sentence to life in prison without benefit of parole, probation or suspension of sentence.
AFFIRMED.
NOTES
[1] Detective Burke testified that he examined the Defendant's hands and did not observe any broken skin, bruises or fractures.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] La.C.Cr.P. art. 768 provides:

Unless The Defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise The Defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.