862 So.2d 208 (2003)
STATE of Louisiana
v.
Donald FAVORITE.
No. 03-KA-425.
Court of Appeal of Louisiana, Fifth Circuit.
November 25, 2003.
*210 Ike Spears, Ron A. Austin, New Orleans, LA, for Appellant.
John M. Crum, Jr., District Attorney, Rodney Brignac, Assistant District Attorney, Edgard, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, WALTER J. ROTHSCHILD and EMILE ST. PIERRE, Pro Tempore.
JAMES L. CANNELLA, Judge.
The Defendant, Donald Favorite, appeals from his conviction of manslaughter and his sentence of 29 years imprisonment at hard labor. We affirm and remand.
The Defendant was initially charged with the second degree murder of Brice Grows (Grows) on May 17, 2000. Various pre-trial motions were filed and the case was tried by a jury on June 12 through June 14 of 2001. On the first day of trial, the Defendant filed a motion in limine to allow evidence of the dangerous character of the victim to be presented. The trial judge deferred ruling on the motion until commencement of the trial. During the trial, a closed hearing was held on this motion, following which the motion was denied. The jury subsequently found the Defendant guilty of manslaughter, a violation of La.R.S. 14:31. The Defendant was sentenced to imprisonment at hard labor for 29 years, with credit for time served.
Near midnight on April 1, 2000, the Defendant drove himself and three of his friends, Michael Johnson (Johnson), Rory Weber (Weber) and Kendall Vedol (Vedol) from Vacherie, Louisiana to a party at the Hot Spot Lounge in Edgard, Louisiana. Upon arriving, the Defendant, Johnson and Vedol went inside the lounge while Weber remained outside. Vedol had just *211 bought the first round of drinks for his friends when someone entered the bar and told them that Weber wanted them to go outside. A crowd of people was gathered there observing an argument between Weber and Grows. Upon seeing this, the Defendant walked to his car, suggesting to his friends that they leave with him. The Defendant testified that Grows cursed him when he saw him. The Defendant retorted that Grows didn't even know the Defendant, but Grows insisted that he did. Grows stated that he was going to stop the Defendant and his friends from coming down to Edgard in the future. Grows then threw a cup of liquid in the Defendant's face. The Defendant again told his friends that they were leaving. As they walked to the Defendant's vehicle, Grows threw a can of beer at him. The bartender then pulled Grows away from the scene toward the bar.
The Defendant's car, a four-door, medium-sized Mercury with tinted windows, was parallel parked with the front toward the street and the rear facing the lounge. The Defendant got into the driver's seat. Because the cars parked in front and behind the Defendant's vehicle were about one and one-half feet apart, and because it was dark and his windows were tinted, the Defendant had his door open while he attempted to maneuver his car out of the spot. According to the Defendant, Weber was outside the vehicle directing his driving. Johnson was in the car. Suddenly, Grows moved across the lot toward the Defendant from the area near the bar where he had been taken by his friends. The Defendant saw him coming, and as Grows neared the Defendant's car, the Defendant fired several shots, striking Grows. He died at the scene. The Defendant, Weber and Johnson left the scene and drove to the Defendant' girlfriend's house in Magnolia, where he called his parents. The other men drove off in the car. Later, the Defendant and his father went to the police station in St. James Parish where the Defendant turned himself in to the police. He was subsequently taken to the police station in St. John the Baptist Parish.
After leaving the Defendant's girlfriend's house, Johnson drove the vehicle toward his house. However, they were stopped by the police at the Westbank Reception Center, as a result of the police alert sent out to the local sheriffs' offices. When Johnson saw the police, he threw the gun from the car. He was on probation at the time. The weapon and magazine were recovered in St. James Parish by St. James Parish Deputy Steve Brignac. The gun, a 9mm Luger, contained one live round of ammunition in the chamber and 12 live rounds of ammunition in the clip.
Sergeant Michael Davis, a crime lab technician with St. John the Baptist Parish Sheriff's Office, investigated the incident. At the scene of the shooting he recovered eight spent casings, a live round of ammunition, a spent bullet and a copper jacket from a spent bullet. Three bullets were found in one grouping and five bullets in another. This evidence was recovered from a gravel road adjacent to the front of the Hot Spot Lounge. Sergeant Davis also took autopsy photographs and obtained the victim's clothing and a bullet recovered during the autopsy. He later was given the weapon, clip and live ammunition from Deputy Brignac. After analysis, the experts determined that the recovered weapon fired the shots that killed Grows.
On appeal, the Defendant does not contest that he shot Grows. He asserts that the evidence was insufficient to support a conviction for manslaughter because the Defendant acted in self-defense and with *212 justification. He also argues that the trial judge erred in excluding witnesses that would have testified to Grows' violent and dangerous character and that the sentence is excessive.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Johnson, 01-1362, p. 7-8 (La.App. 5th Cir.5/30/02), 820 So.2d 604, 608, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Cazenave, 00-183, p. 14 (La.App. 5th Cir.10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Id.; State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56.
Defendant was found guilty of manslaughter. At the time of the commission of this offense, manslaughter was defined in La.R.S. 14:31, in part, as follows:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled at the time the offense was committed ...
"Sudden passion" and "heat of blood" distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors which may reduce the grade of the offense. State v. Mason, 00-1223, p. 8 (La.App. 5th Cir.1/30/01), 782 So.2d 1093, 1098, writ denied, 01-0784 (La.11/16/01), 801 So.2d 1075. In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id.; State v. McKinney, 99-395, p. 10 (La.App. 5th Cir.11/10/99), 749 So.2d 716, 721, writ denied, 00-0144 (La.9/29/00), 769 So.2d 550.
Under La. R.S. 14:20, a homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the state must prove, beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953, 956 (La.1986); State v. Sprinkle, 01-137, p. 16 (La.App. 5th Cir.10/17/01), 801 So.2d 1131, 1141, writ denied, 01-3062 (La.10/25/02), 827 So.2d 1174, cert. denied, 537 U.S. 1235, 123 S.Ct. 1358, 155 L.Ed.2d 200 (2003); State v. Barnes, 98-932, p. 4 (La.App. 5th Cir.2/10/99), 729 So.2d 44, 46, writs denied, 99-1018 (La.9/17/99), 747 So.2d 1099, 01-0519 (La.10/12/01), 799 So.2d 499. The relevant inquiry on appeal is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. Sprinkle, *213 01-137 at p. 16, 801 So.2d at 1141; Barnes, 98-932 at p. 5, 729 So.2d at 46.
In Johnson, we stated that "The determination of a defendant's culpability rests on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger." Johnson, 01-1362 at 8, 820 So.2d at 608, While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. Johnson, 01-1362 at 8, 820 So.2d at 609.
Under La. R.S. 14:21, an aggressor cannot claim self-defense. The statute provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
In this case, the versions of the events provided by the witnesses were conflicting. Numerous eyewitnesses[1] testified. The witnesses agreed that Grows was initially engaged in an argument with Weber,[2] that the Defendant had attempted to defuse the situation by telling his friends that they were going to leave the area[3], that Grows threw a cup of liquid and a can of beer on the Defendant[4], that Grows was pulled away by spectators,[5] and that Grows again approached the Defendant and his friends.[6] The testimony of both State and defense witnesses also indicated that the Defendant and his friends were attempting to drive away when Grows approached their vehicle.[7] None of the witnesses actually saw anything in the victim's hands as he approached the Defendant.[8].
There was conflicting testimony regarding the victim's actions as he went toward the Defendant and his friends. The State's witnesses[9] testified that Grows' hands were up in the air as he went toward the Defendant. Some of those witnesses testified that Grows "walked"[10] toward the Defendant and his party, while other State and defense witnesses testified that Grows "ran" toward them. In addition, The Defendant, Vedol and Webre said that Grows had his right hand behind his back as he approached. At least one defense witness, Johnson, testified that *214 Grows stopped and entered a dark truck before running toward the Defendant. Webre added that someone threw rocks at them, striking the vehicle as the men tried to drive from the parking lot. Hamilton, Vedol and the Defendant said that Grows was threatening and verbally abusive to the Defendant as he (Grows) approached the vehicle. Two other witnesses indicated that Grows was followed by other men as he approached the car. Lumar, Bailey, Hamilton, Jackson and B. Johnson testified that the Defendant shot Grows after getting out of the car, while Gauthier, Vedol and the Defendant insisted that he was in the car when he fired the shots.
Dr. Frazier McKenzie, a medical examiner with Jefferson Parish, performed the autopsy on Grows. According to Dr. McKenzie, the victim died of a fatal gunshot wound to the abdomen, which entered the right front side of the body. The victim was shot multiple times, with bullets also piercing the liver, spleen and kidneys. Additionally the victim was shot in the outside of the right lower arm and the right leg. Dr. McKenzie testified that the bullets that struck the arm and leg entered from behind the victim, with three bullets entering and two grazing the victim.
Patrick Lane (Lane) of the State Crime Laboratory, an expert in firearms and ballistics, examined the 9mm weapon recovered in this case, as well as three fired projectiles and eight cartridge casings. He concluded that this firearm fired the recovered projectiles and casings. He also testified that the weapon was semi-automatic and that the trigger had to be pulled for each firing. Lane reviewed the photographs, which revealed the placement of the bullets found at the scene and concluded that there had been a "dynamic type movement of the shooter" and that the shooter had been in two different positions.
The jury apparently concluded that Grows was initially the aggressor when he confronted and assaulted the Defendant by throwing two drinks on him, that this provocation was sufficient to deprive an average person of self-control and that an average person's blood would not have cooled between the time of this incident and the shooting, thus warranting a verdict of manslaughter rather than second degree murder. However, they apparently did not believe either that the Defendant was in jeopardy of death or great bodily harm or that he may have been, but the killing was not necessary to prevent his death or great bodily harm. See: La. R.S. 14:20(1). The evidence was conflicting about whether the approaching victim was armed or dangerously aggressive and the jury could have concluded that the Defendant, who was in a car, could have safely left the area instead of shooting the victim. Based on the evidence, the jury could have concluded that the Defendant became the aggressor and that his claim of self-defense was not supported by the facts. This conclusion is also supported by the medical examiner's findings that at least some of the bullets entered the victim from behind. These are credibility determinations and this Court cannot assess credibility nor reweigh the evidence on appeal. Cazenave, 00-183 at p. 14; 772 So.2d at 860; Marcantel, 00-1629 at p. 9; 815 So.2d at 56. Accordingly, we find that the State proved beyond a reasonable doubt the essential elements of the crime of manslaughter and that the Defendant did not act in self-defense.
In his second assignment of error, the Defendant contends that the trial judge erred in excluding witnesses who would testify to the violent and dangerous character of the victim. On June 12, 2001, the Defendant filed a Motion in Limine to allow him to present evidence of the victim's *215 hostile traits and general character evidence at trial in order to buttress his position of self-defense. On the first day of trial, prior to jury selection, the motion in limine was heard. The trial judge deferred ruling on the admissibility of the evidence until trial, and he expressed concern that the defense would have to present "appreciable evidence" of an overt act under La.C.E. art. 404. The trial judge reasoned that such evidence would form the basis of trial testimony and he would make a ruling at the appropriate time. Following the presentation of the State's case and all but one witness in the Defendant's case, a hearing was held, out of the presence of the jury, regarding the admissibility of victim character evidence.
At the hearing, the Defendant alleged that Grows was the aggressor because he charged the Defendant's car, threw two drinks on the Defendant and had to be restrained and pulled from the scene. Thus, the Defendant argued that he should be permitted to present victim character evidence through the testimony of Martin Harry (Harry), Kenny Trufant (Trufant), Mark Bergeron (Bergeron), and Sheldon Cannon (Cannon). According to the Defendant, Harry would testify that he and the Defendant once went to Edgard and a shooting had occurred. During the shooting, some people from Vacherie attacked the Defendant and Harry and fired shotgun pellets at them, striking the Defendant. The Defendant later learned one of the persons involved was Grows. The Defendant wanted to introduce the evidence to corroborate testimony of Deputy Brignac[11] and Lieutenant Earl Geason[12] that the Defendant was previously shot at the same lounge, and to show the Defendant's state of mind. The Defendant stated that Trufant would testify that the victim put a gun to Trufant's head in the past. The Defendant stated that Bergeron would testify that Grows and his friends tried to "jump" Bergeron and his friends the week before the current incident. Cannon would testify that he stopped the victim from fighting several times and Cannon's brother witnessed the current incident and believed that the Defendant shot the victim in self-defense.
The State objected on the basis that there had been no proof of a hostile demonstration or "overt act" on the part of the victim in this case. The State alleged that putting a hand behind one's back was insufficient to demonstrate an "overt act" and additionally, there was considerable evidence to indicate that the victim approached the Defendant with his hands in the air. The State further argued that Harry's testimony would be unreliable and unduly prejudicial. The trial judge ruled that the evidence was inadmissible, stating:
THE COURT:
I take different tacks in analyzing this, especially when I'm considering the overt acts individually. As the first tack, I don't find any of the acts of Brice Grows to be raised to the specter that would trigger the permissibility of character evidence.
With that said, I go on to a more expansive approach where I hear this theory aboutaboutI don't know about too much lawbut totally of facts. One drink being thrown, a second being *216 thrown, and this testimony about charging with the hand behind the back.
I come up with the same answer: That after this analysis takes place, at least in my analysis, I still don't think he's raised himself above the bar ... to permit character evidence by admissibility under 404.
I don't come to the hearsay problem because it stops there. It's a ruling based solely on the 404 issue. And I have great problems with the hearsay issue but I'm not addressing it because it's not coming in under the 404, so I'm not going any further than I have to go.
The offense certainly is the most violent offense. It's just a defense that's not going to [sic] forward with this man's testimony....
Following this ruling, the Defendant stated that he wanted to proffer the evidence, but then decided not to do so and merely lodged an objection to the trial court's ruling.
For an error to be predicated upon a ruling excluding evidence, a substantial right of a party must be affected and the trial court must be informed of the substance of the excluded evidence. La.C.E. art. 103(A)(2); State v. Lobato, 603 So.2d 739, 748 (La.1992); State v. Joseph, 01-360, p. 25 (La.App. 5th Cir.10/17/01), 802 So.2d 735, 745.
The Defendant advised the trial court that he decided not to proffer the evidence and such an action normally constitutes a waiver of the claim for appellate review. State v. Batiste, 96-1010, p. 8 (La.App. 5th Cir.1/27/98), 708 So.2d 764, 769, writ denied, 98-0913 (La.9/4/98), 723 So.2d 954. However, since the Defendant did lodge an objection and informed the trial court of the substance of the evidence he sought to present, we will consider the merits of the claim. La.C.E. art. 103 A(2).
La.C.E. art. 404 controls the admissibility of character evidence during a criminal trial, and provides, in pertinent part, as follows:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except....
(2) Character of victim. (a) Except as provided in Article 412 [rape shield], evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible[.]
...
B. Other crimes, wrongs, or acts

....
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible....
Evidence of a victim's dangerous character is admissible only if the accused first produces evidence that, at the time of the incident, the victim made a hostile demonstration or committed an overt act against the accused of such character that would have created, in the mind of a reasonable person, the fear that he was in immediate danger of losing his life or suffering great bodily harm. State v. Edwards, 420 So.2d 663, 670 (La.1982); *217 State v. Jones, 99-798, p. 5 (La.App. 5th Cir.11/10/99), 748 So.2d 1176, 1179, writ denied, 00-306 (La.12/8/00), 775 So.2d 1076. Once the defendant establishes the commission of an overt act, evidence of threats and of the victim's dangerous character is admissible for two purposes: (1) to show the defendant's reasonable apprehension of danger justified his conduct; and (2) to help determine who was the aggressor in the conflict. Edwards, 420 So.2d at 670; Jones, 99-798 at p. 5, 748 So.2d at 1179. A trial judge's determination that a defendant has not laid a sufficient evidentiary foundation upon which to introduce testimony concerning the victim's dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson, 419 So.2d 425, 427 (La. 1981).
In this case, Vedol testified that the victim first threw a drink on the Defendant and hit him with a beer can before he was pulled from the scene by a spectator. According to this witness, the victim then "came running back toward the car with his hand behind his back." However, on cross-examination, he admitted that he could not see the victim's hands as the victim got near the car. It is significant that Vedol testified that he did not feel threatened by the victim.
Weber testified that he saw the victim throw two drinks on the Defendant before the victim's friends pulled him away. Weber testified that the victim was running toward the car and when he got near the car "he went behind his back like he had something." Weber, likewise, testified that he was not afraid of the victim, even though the victim had reportedly confronted him earlier that night.
Johnson testified that he saw the victim argue with the Defendant, curse and throw a drink on him. Johnson stated that the victim had been pulled away but he ran back and threw a can of beer, hitting the Defendant. The victim was then dragged across the parking lot. Johnson testified that he saw the victim go inside a truck across the parking lot and that he "came running back at us with his right hand behind his back." However, when asked if the victim had a gun, Johnson replied, "I couldn't see through the tint, sir, once he passed me." He also stated that he could see the victim running toward the car because his car door was open. Johnson could not remember if the victim was saying anything as he approached the Defendant's vehicle. Johnson testified that he watched the victim run all the way up to the car. Although his window was tinted and up, Johnson could see because he was paying "attention to details" and he "watched the bullets, the shirt, t-shirt, suck in where the bullets hit him at."
In State v. Jackson,[13] 419 So.2d 425 (La. 1981), the Louisiana Supreme Court considered a case in which the victim approached defendant with her right hand behind her back while cursing the defendant. The defendant fired a warning shot, but the victim continued to advance with her hand behind her back. A second shot was fired which was aimed low and hit the victim in the leg, but the victim continued to advance. The defendant was then backed up against a parked car and she fired the fatal shot when the victim was closest to her and still advancing. The Court found the defendant had established the foundation for the admissibility of the victim character evidence and reasoned:

*218 The fact that the victim continued to advance on the defendant in a hostile and frightening manner even after the defendant has fired two shots was enough to make the defendant believe that the victim was concealing a weapon. The relevant inquiry is not whether or not the victim actually had a weapon behind her back, but whether or not the defendant could reasonably believe she did. In this case, the defendant could have reasonably believed that she was in imminent danger of death or great bodily harm.
State v. Jackson, 419 So.2d at 427.
In State v. Cavalier, 421 So.2d 892 (La. 1982), the defendant alleged that the victim was armed with a gun, was verbally aggressive in an argument with him, and made several different hand motions while approaching him. The defendant argued that these actions constituted an "overt act" for purposes of La.C.E. art. 404. The state's witnesses had all testified that the victim did not own a gun and did not possess one when he was shot. The defendant's witnesses testified that the victim possessed a gun that was removed by the defendant's cousin after the shooting. The Louisiana Supreme Court concluded that the fact that the victim got up from the sidewalk and was reaching behind his back into his waistband while approaching the defendant was not an overt act.
In State v. Johnson, 94-287 (La.App. 5th Cir.9/27/94), 643 So.2d 1323, writ denied, 94-2790 (La.4/7/95), 652 So.2d 1344, this Court found that the defendant had not met the threshold test of showing an "overt act." There was conflicting evidence on the actions of the victim shortly before the defendant beat him to death with a baseball bat. According to the defendant, he and the victim had "been feuding for a couple of days" and the two encountered each other at a local bar.
The defendant testified that he first left the bar because his seafood order was not ready when he arrived. According to the defendant, as he was leaving, some people standing outside told him that the victim was threatening to kill him. When he returned to the bar, the victim was seated eating seafood. According to the defendant, upon seeing him, the victim turned around and reached in his pants. The defendant then struck the victim.
Several witnesses testified that the victim's hands were in or near his plate of food. However, two witnesses testified that they saw a gun-butt sticking out of the waistband of the victim's pants when he fell to the floor. A bar patron testified that he saw the victim attempt to reach for his waistband while being struck by the defendant. According to this witness, someone in the club removed the gun and handed it to the victim's brother.
In the present case, in addition to the evidence that the victim and the Defendant had disengaged after the victim threw two drinks on him, the Defendant failed to establish that shortly before the shooting the victim approached the Defendant in a threatening manner. Moreover, there was considerable evidence that the victim approached the Defendant with his hands in the air. Additionally, no one ever saw the victim in possession of a weapon that night. In this case, as in Cavalier and Johnson, the Defendant did not satisfy his burden of showing, "by appreciable evidence" an overt act of the victim which would create in the mind of a reasonable person a belief that he was in imminent danger of losing his life or suffering great bodily harm. Thus, we find that the trial judge did not err in finding the evidence inadmissible at trial.
The Defendant next contends that his sentence is excessive. He argues that the trial judge failed to consider sentencing *219 guidelines and failed to tailor the sentence to the offender and offense.
In determining a sentence, the trial court is to consider the sentencing guidelines set forth by La.C.Cr.P. art. 894.1. The sentencing court "shall state for the record the considerations taken into account and the factual basis therefore in imposing sentence." La.C.Cr.P. art. 894.1(C). However, when the trial judge fails to articulate every circumstance listed in La.C.Cr.P. art. 894.1, a remand is not necessary if there is an adequate factual basis for the sentence contained in the record. State v. Fairley, 02-168, p. 8 (La.App. 5th Cir.6/26/02), 822 So.2d 812, 817.
Both the United States and Louisiana constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. Amend. 8, La. Const. of 1974, Art. I, Sect. 20; State v. Richmond, 98-1015 (La.App. 5th Cir.3/10/99), 734 So.2d 33, 38. A sentence is generally considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Richmond, 734 So.2d at 38; State v. Lobato, 603 So.2d 739, 751 (La.1992). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. However, the sentence will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. Richmond, 734 So.2d at 38. The trial judge is afforded wide discretion in determining a sentence and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D); Richmond, 734 So.2d at 38. In making this determination, the sentencing judge may consider not only convictions, but also past criminal behavior that did not result in a conviction. State v. Anderson, 02-273, p. 7 (La.App. 5th Cir.7/30/02), 824 So.2d 517, 522, writ denied, 02-2519 (La.6/27/03), 847 So.2d 1254; State v. Gilbert, 00-1822, p. 5 (La.App. 5th Cir.5/16/01), 788 So.2d 574, 577. Nonetheless, a sentence may be reviewed for excessiveness even though it is within statutory range. Richmond, 734 So.2d at 38.
After reciting the procedural history of the case and the fact that he ordered and considered the pre-sentence report, the trial judge gave the following pertinent reasons for sentencing:
I'm merely the sentencing authority. Some of the factors I've considered. 894 factors, of course was the fact that a very crowded area was involved. The endangerment of a great number of people made an impression upon me. There was, in fact, a victim. Death resulted. The defendant afterwards fled from the area. And certainly a dangerous weapon was involved. While I considered all of the aggravating circumstances, these are the ones that have become most to my mind. So I consider other sources when I come to sentence. I notice that Mr. Favorite has no appreciable criminal record. He is a true first time offender. That will be figured into my sentence today. Other sources I've gleaned in my sentence consideration are those factors found in the presentence investigation, which was filed by the Department under the hand of Mr. Jones and Mr. Arabie. Particularly touching were the letters filed on behalf of Mr. Favorite. Mr. Miceli did yeoman's duty in assembling no less than a hundred and sixty-three letters. I'm sure there were more, but I was presented with a hundred and sixty-three letters from co-employees, ministers, members of the community. All sorts of people up and down the river. You, *220 indeed, have many friends there, Mr. Stewart, Mr. Favorite, excuse me. They are all concerned for your welfare and they've effectively asked for leniency in sentencing. The crime is such a crime that a suspended sentence is not possible. It is a very serious crime. A death resulted. That was, of course, foremost on my mind. The possible sentence that I could give you would range anywhere from no sentence, to that of forty years with the Department of Corrections. It's under my considered opinion, and I took a good while to consider this, and as the Court says, to individualize the sentence, that I determined that twenty-nine (29) years is the term of your incarceration.
(Emphasis added).
The trial judge considered both the aggravating and mitigating factors. The aggravating factors included the severity of the crime, that a weapon was used, that a death resulted, that numerous persons were endangered, and that the Defendant fled from the crime scene. Among the factors in mitigation, the trial judge considered the pre-sentence report which reflected that the Defendant was a first time felony offender, that he was a young man who had a high school education, that he was gainfully employed and respected in the community, as was evidenced by numerous letters of support submitted on his behalf. We find that the trial judge complied with the sentencing guidelines of La. C.Cr.P. art. 894.1.
The Defendant next argues that the sentence is excessive in light of the nature of the offense and the background of the offender. The Defendant was tried on the charge of second degree murder, under La.R.S. 14:30.1, which, upon conviction, carries a mandatory life sentence. He was convicted of the responsive verdict of manslaughter, which carries a maximum sentence of 40 years imprisonment at hard labor. La.R.S. 14:31. A pre-sentence report recommended the trial judge to impose the maximum sentence of 40 years. The trial judge imposed a 29 year sentence, which was within statutory limits.
In the case of State v. King, 00-1434 (La.App. 5th Cir.5/16/01), 788 So.2d 589, writ denied, 01-2456 (La.9/20/02), 825 So.2d 1157, this Court affirmed a sentence of 25 years of imprisonment for manslaughter for a first time felony offender. In King, the defendant had alleged that the victim stole money from him and when the defendant went to confront the victim about the alleged theft, the defendant shot the victim several times, one time from the rear, killing him. The defendant was charged with second degree murder, but found guilty of manslaughter.
The facts of the present case are more egregious than those in King. Here, the Defendant's actions endangered more than one person. Although the Defendant was a first time felony offender, he nonetheless fired nine shots, in an area surrounded by spectators, striking the unarmed victim several times (some shots from the rear) killing him, before fleeing the scene. Under these circumstances, we find that the trial judge did not abuse his sentencing discretion in imposing the 29 year sentence.
The Defendant also argues that the trial judge erroneously instructed the jury that he would impose a sentence of "four" years of imprisonment upon a conviction of manslaughter. This Court requested the court reporter to recheck the trial judge's instructions against both her primary and backup systems. She discovered that the trial judge said "forty" not "four" years and she amended her transcript accordingly. Therefore, this alleged error lacks merit.
*221 ERROR PATENT
We have reviewed the record for patent errors pursuant to the Defendants request and in accordance with La.C.Cr.P. art. 920. See: State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Perrilloux, 99-1314 (La.App. 5th Cir.5/17/00), 762 So.2d 198.
According to the minutes, the trial judge advised the Defendant of the prescriptive period for filing for post conviction relief at the time of the appeal bond hearing, not at the sentencing. Since there is no transcript of that hearing, we cannot determine if the advisory was correct. Thus, we will remand the case with an order for the trial judge to send written notice to the Defendant of the prescriptive period for filing an application for post-conviction relief, along with a notice of when the period begins to run, within ten days of the rendering of its opinion, then to file written proof in the record that the Defendant received the notice. See: State v. Esteen, 01-879, p. 28 (La.App. 5th Cir.5/15/02), 821 So.2d 60, 78.
Accordingly, we hereby affirm the Defendant's conviction and sentence. We remand the case with an order to the trial judge to send to the Defendant, within ten days of the rendering of this opinion, written notice of the prescriptive period for post conviction relief, along with a notice of when the period begins to run, and then to file written proof in the record that the Defendant received the notice.
CONVICTION AND SENTENCE AFFIRMED. CASE REMANDED.
NOTES
[1] The State called Anunka Lumar (Lumar), Chasna Narcisse (Narcisse), Clifford Bailey (Bailey), Chester Hamilton (Hamilton), Harvey Tilton (Tilton), Sharonne Gauthier (Gauthier), Jerome Jackson (Jackson), Brandon Johnson (B.Johnson), and Carlo Savoie (Savoie). The Defendant called Vedol, Weber and Johnson.
[2] Jackson, B. Johnson and Webre.
[3] Lumar, Weber, M. Johnson and the Defendant.
[4] Lumar and Jackson.
[5] Lumar, Narcisse, Hamilton, Gauthier, Jackson, B. Johnson, Vedol, Weber, Johnson and the Defendant. Of these witnesses, Hamilton, Weber, Johnson, and the Defendant testified that Grows was removed twice from the scene.
[6] Lumar, Bailey, Hamilton, Gauthier, Jackson, B. Johnson, Savoie, Vedol, Weber, Johnson and the Defendant.
[7] Lumar, Hamilton, Gauthier, Jackson, B. Johnson, Weber, Johnson and the Defendant.
[8] Lumar, Narcisse, Bailey, Tilton, Jackson, Savoie, Vedol, Weber, and the Defendant.
[9] Lumar, Hamilton, Gauthier, Jackson, and B. Johnson.
[10] Lumar and Hamilton.
[11] Deputy Brignac testified that the Defendant did not indicate the same person was involved in the prior shooting and this incident.
[12] Lieutenant Geason testified that the Defendant indicated that he had previously been shot by the same person whom the Defendant shot. However, the Defendant never identified Grows and the officer stated that he did not know if the Defendant knew him.
[13] On rehearing, the conviction was reversed and a new trial was ordered after the Louisiana Supreme Court concluded that the exclusion of victim character evidence prejudiced the defendant. State v. Jackson, 419 So.2d at 429.