MARION F. EDWARDS, Judge.
Defendant, Natelie E. Hebert,- appeals his conviction for manslaughter, a violation of LSA-R.S. 14:31. For the foregoing reasons, defendant’s conviction is affirmed, we amend defendant’s sentence, and we further remand to the trial court to correct errors patent on the face of the record.
FACTS AND PROCEDURAL HISTORY
On March 14, 2002, the Jefferson Parish Grand Jury issued a two-count indictment charging defendant, Natelie Hebert (“Hebert,”) with second degree murder of Robert Hughes, a violation of LSA-R.S. 14:30.1, ánd attempted second degree murder of Lorenzo Craft, in violation of LSA-R.S. 14:27 and 14:30.1. Hebert was arraigned on March 15, 2002, and entered pleas of not guilty to both charges.
Hebert made pre-trial motions to suppress statements and identification.[1] On June 13, 2002, the court heard both motions. The motion to suppress the jydentiftcation was denied that day, and the motion to suppress statements was held open. On July 10 and 11, 2003, the court heard additional evidence as to the motion to suppress statements, and the court denied that motion as well.
Trial began before a jury on September 23, 2002. On September 24, 2002, the court declared a mistrial due to emergency weather conditions. Hebert was tried by a twelve-member jury on May 19, 20, and 21, 2003. As to count one, the jury found Hebert guilty of the lesser offense of manslaughter, a violation of LSA-R.S. 14:31. As to count two, the jury found Hebert guilty as charged.
Hebert made a motion for post-verdict judgment of acquittal,[2] which the court denied in open court on September 3, 2003. Hebert thereafter waived statutory delays, and the trial court sentenced him on count one to twenty-five years at hard labor without suspension of sentence. On count two, the court sentenced defendant to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence. The court further ordered that the sentences run concurrently to each other. Hebert made an oral motion for appeal and filed a written motion for appeal on September 5, 2003, which the court granted that same day.
At 5:56 a.m. on January 25, 2002, Nate-lie (“Nat”)’ Hebert, made a 9-1-1 telephone call from his trailer home at 678 Jean Lafitte Boulevard in Lafitte. He reported, “Two guys tried to get in, break in my house to beat me up.” Hebert told the dispatcher he had stabbed both subjects. He said that one of the men, later identified as Lorenzo Craft, escaped and headed toward a nearby E-Z Serve convenience store. Craft was picked up by someone in a white Dodge truck. The other man was still in the house, and was not moving. *1117 Hebert admitted that he had “stabbed him a bunch of times.”
| ¿Defendant told the dispatcher that the man who remained in the house was Robert Hughes. He explained that he and Hughes had argued about money, and that a fistfight ensued. He retrieved a knife from the kitchen, and Hughes tried to take it from him. Hebert said he started stabbing Hughes. Hughes’ companion then attacked Hebert, trying to get him off of Hughes. Hebert said he stabbed that man in the back.
Lorenzo Craft testified that he was with Robert Hughes in the early morning hours of January 25, 2002. They rode around in a Ford Escort Craft characterized as a “rock rental.” Hughes sold crack cocaine to various people, including Hebert. After Craft and Hughes returned the Escort to its owner, Hebert drove them to his trailer in his station wagon. Hebert said he had to get something, and went inside the trailer. Craft and Hughes stayed in defendant’s car. Some time later, Hebert called for Hughes to go inside the trailer, and Hughes complied. Craft did not detect anything threatening in Hebert’s behavior.
Craft testified that while he waited in the car, he heard noises from inside the trailer. After ten minutes, Hebert exited the trailer and told him Hughes wanted him. Craft did not see Hughes. Sensing something was amiss, Craft picked up a knife he saw in the car, and threw it on the ground outside the vehicle. He started to get out of the car, and Hebert began stabbing him repeatedly. Craft did not have a weapon.
Craft was eventually able to grab Hebert’s knife and throw it in a nearby wooded area. Craft fled on foot, and Hebert pursued him in his car. Craft then made it to the nearby E-Z Serve convenience store, where he flagged down a white truck and climbed into the back of the vehicle. Lionel Fitzgerald, the truck’s driver, testified that Craft said, “He’s trying to kill me,” and “my partner [sic] dead.”
| ^Fitzgerald saw a car approaching from the opposite direction, and he thought someone was coming to help Craft. However, the other ear’s driver turned and pulled alongside Fitzgerald’s truck, trying to run it off the road. Fitzgerald recognized the driver as Natelie Hebert. Hebert yelled to Fitzgerald that the wounded man had robbed him. Fitzgerald managed to evade Hebert.
Deputy Bruce Chauvet of the Jefferson Parish Sheriffs Office was dispatched to Hebert’s trailer. He testified that en route to the residence, he received information that there was a victim at the E-Z Serve at 798 Jean Lafitte Boulevard. Chauvet stopped at the store, where he found Lorenzo Craft. Craft had been stabbed, and he directed Chauvet to Hebert’s trailer to find another possible victim.
Chauvet and Deputy Steve Higgerson proceeded to Hebert’s trailer. There were blood spatters and smears on the door and outside walls. Chauvet found the body of a man lying on the floor. He found that the victim, whom he identified as Robert Hughes, had sustained a serious chest wound. When the officers arrived, Hebert was still speaking on the telephone to the 9-1-1 operator.
Chauvet advised defendant of his Miranda[3] rights at the scene, and asked defendant to explain what had happened. Hebert told him he agreed to give Robert Hughes and Lorenzo Craft a ride. He parked his vehicle outside of his trailer and asked the men to stay in his vehicle. Hebert told them he was going inside to tell his wife where he was going. Hebert went *1118 into the bedroom where his wife was sleeping. When he emerged, he found Hughes standing’in the living room. Hughes demanded that- defendant make good on á one hundred dollar crack cocaine debt. An argument ensued, and Hughes punched Hebert. Hebert told Chauvet that he went to his kitchen and took a knife out of a drawer. Hebert said Hughes threatened to kill him, and he responded by lunging at Hughes with the Rknife. . Defendant said Craft entered the trailer after the altercation began. Hebert told Chauvet that he had attacked Craft and stabbed him.
Hebert showed Chauvet an injury to his left hand. Higgerson testified that Hebert was examined by emergency medical technicians, and was later treated at the Medical-Center of Louisiana for lacerations to his hands.
Lieutenant Grey Thurman of the homicide division supervised the collection and photographing of evidence -at the scene. He testified that upon arriving at the trailer, he found a car parked in the driveway, its door ajar. There was blood on the outside of the car. A large,, wooden-handled kitchen knife was lying near the car. There was blood on the raised platform at the trailer’s front doorway. Robert Hughes’ body was lying just inside the front door.
A paring knife was found several feet from the body, and a potato peeler .tyas near the victim’s feet. There was no blood found on either object. A knife with a broken handle was found under the body. There were three rocks of crack cocaine in a plastic bag inside the victim’s sock.[4] .
Deputy Joseph Kreiger testified that he transported defendant to the detective bureau. Sergeant John Drury of the homicide division conducted a tape recorded interview with defendant. The audiotape and a typewritten transcript of it were admitted in evidence at trial, and the tape was played for the jury. Hebert told Dru-ry that he initially met Robert Hughes through a friend, and that Hughes routinely-. sold him narcotics. He talked to Hughes a few times during the night, and Hughes called him at about 4:00 a.m. to ask for a ride home. When Hebert picked up Hughes, the victim was with a black man (Craft) whom Hebert had met on prior occasions. Hughes gave him two pieces of crack cocaine in exchange for the ride.
RHebert stated that he drove to his house, and told the two men he was going to tell his wife where he was going. He went into the bedroom, and when he came out, he saw Hughes was inside of the trailer. .Hughes told Hebert that he owed him one hundred dollars for cocaine he had given him on a prior occasion. Hebert told Hughes he had satisfied that debt. Defendant said he and Hughes argued about the matter, and eventually Hughes said, “Mother f* * * *r you don’t give me my money I’m going to have to start shooting people ...”
Hughes pushed defendant, and then Hebert took a large knife out of a kitchen drawer and began stabbing Hughes. Hebert told him “I’ll kill- you mother f* * * *r.” He knew Hughes routinely carried a gun, and Hughes had threatened him in the past. Hebert said he stabbed Hughes ten times. Hughes tried to get the knife away from him. Eventually the knife broke, and Hebert reached for another knife and continued to, stab Hughes until the. victim stopped struggling. Hebert admitted that Hughes did not have a weapon at the time of the incident.
*1119 Hebert saw Craft in the doorway, and told him, “I’ll Mil you too mother f* * * *r.” Hebert chased Craft out of the trailer and attacked him in the driveway. Hebert said he stabbed Craft seven or eight times. He stabbed Craft in the back as he ran away. Hebert stated that Craft did not have anything in his hands. Michelle Hebert, defendant’s wife, testified that she and the couple’s young sons were all in the trailer at the time of the incident. The family had visited friends on the night of January 24, and they returned home at 12:30 a.m. on January 25. She and the boys went to sleep. She was awakened by the sounds of fighting coming from the living room. She went into the living room and saw Hebert and Robert Hughes fist fighting. She locked herself and the children in the bedroom.
When the house became quiet, Hebert went into the bedroom and said, “Get out, they broke in.” Ms. Hebert and the children left the trailer through the back | ¡¡door. Hebert called to her from inside, and had difficulty opening the front door. It was blocked by Hughes’ body. When Ms. Hebert got inside, Hebert was speaking to the 9-1-1 dispatcher on the telephone. He told Ms. Hebert to start cleaning the mess. The 9-1-1 dispatcher, however, told Hebert they should not clean anything.
Hebert testified on his own behalf at trial. He stated that he began abusing prescription pain Mllers after incurring a back injury on the job in the mid 1990’s. He eventually started buying pills from Hughes. Hughes then began selling him crack cocaine. Defendant testified that he knew Lorenzo Craft as Hughes’ right-hand man in the drug trade.
Defendant eventually decided to stop using narcotics. When Hebert attempted to end his association with Hughes, the man became irate and started to threaten defendant. In response, defendant met with Detective Renton. According to Hebert, Renton arranged for defendant to work as an informant.[5] The two planned to attempt an undercover drug operation involving Hughes. That undercover buy was supposed to have happened on January 25, 2002.
Hebert testified that he and his family spent the evening of January 24, 2002 at the home of Philip Brinkles and his wife, Rita. When they arrived home at 12:30 a.m. on January 25, he watched television while his wife and children went to sleep. Hughes telephoned between 3:30-4:00 a.m. and asked defendant to pick him up. Hughes indicated that he wanted to give Hebert some dope and to talk to him. Hebert agreed to pick up Hughes so as not to jeopardize the planned undercover drug purchase.
19Hebert arrived at Hughes’ house just as Hughes and Lorenzo pulled up in a car. The two men got into Hebert’s car. Hughes tossed Hebert some narcotics, and Hebert drove to his trailer. He wanted to drop off the drugs there, as he had agreed with Detective Renton not to possess drugs. Hebert left the drugs in the bedroom where his wife was sleeping, and returned to the living room to find Hughes waiting for him. He had not given Hughes permission to enter the house.
Hughes claimed defendant owed him one hundred dollars from an earlier drug *1120 deal. Defendant reminded Hughes that he had agreed to excuse the debt in exchange for the use of defendant’s truck. An argument ensued. Hughes said, “I want my f* * *ing money,” and he hit Hebert. Hebert went to the kitchen drawer and retrieved a knife. Hebert began stabbing Hughes in an attempt to get him out of the house.
Hebert testified, that Craft rushed to the trailer. Assuming Craft would try to help Hughes, Hebert stabbed him repeatedly. When Craft fled on foot, Hebert went after him in his car. He was stopped by the driver of a truck whose help Craft had enlisted.
Hebert stated his hands were cut in the midst of the stabbings, and were bleeding badly. He did not know whether Hughes was dead or alive when he called 9-1-1.
Dr. Susan Garcia of the Jefferson Parish Coroner’s Office was accepted by the court as an expert in the field of forensic pathology. She testified that Dr. Glenn Rudner had performed an autopsy on Robert Hughes, and that she had reviewed Dr. Rudner’s report. Dr. Rudner referenced sharp force injuries to the victim’s neck, head, chest, ribs, lungs, and heart. Some of the injuries were cuts, while others were stab wounds.
There was a particularly large wound to the chest that was probably caused by a combination of stabbing and dragging motions. It was a lethal wound. j1(1Another blow to the upper back entered the lung, and could be considered lethal, depending, on how much blood was lost from that area.
In his first assignment of error, Hebert' complains that the evidence was insufficient to support his manslaughter conviction, as the state failed to meet its burden of, proving that defendant did not act in self-defense. In considering a claim of insufficient evidence, an appellate court must determine whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime were proved beyond a reasonable doubt.[6]
At the time of the instant offense, LSA-R.S. 14:31 defined manslaughter, in pertinent part, as follows:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
“Sudden passion” and “heat of blood” distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors which may reduce the grade of the offense.[7]
Under LSA-R.S. 14:20, a homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing' is necessary to save himself from that danger.
When a defendant claims self-defense in a homicide situation, the state must prove, beyond a reasonable doubt, that the defendant did not act in self-defense.[8] ^[yThe relevant inquiry on ap *1121 peal is whether a rational factfinder, upon viewing the evidence in 'the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense.[9]
The determination of a defendant’s culpability is based on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger.[10]
Hebert argues that he reasonably believed his life was in imminent danger based on Hughes’ reputation as a drug dealer who carried a gun. Hebert testified that he knew Hughes to always carry a gun. Both Hebert and his wife testified to an incident that occurred the day before the stabbing incident, wherein Hughes went to Hebert’s residence and accused him of obtaining drugs from a source other than Hughes. Both Hebert and Ms. Hebert testified that Hughes waved a gun in Hebert’s face. Hughes told Hebert, “I’ll kill anybody that play with my money.” Hebert further testified that he and his friend Philip Brinkle encountered Hughes at a convenience store on the night of January 24, 2002. Hughes accused Hebert of doing business with Brinkle, and threatened to kill both Hebert and Brinkle.
Hebert testified at trial that he stabbed Hughes and Craft to save his own life and to protect his family. Of his own accord, however, Hebert stated that he drove Hughes and Craft to his own residence despite having so recently received threats from Hughes. Craft testified that Hebert invited Hughes into the trailer. Hebert also testified that Robert Hughes was at his house on a regular basis in the months before the incident.
Iii his trial testimony, Hebert implied that Hughes may have had a knife. He testified that during their altercation, Hughes was swinging an unknown object, and that he felt pain in his hands when he attempted to grab Hughes’ hands. There liswas, however, no evidence at trial that Hughes was carrying any type of weapon at the time of the stabbing. The evidence was to the contrary. Ms. Hebert, who witnessed the fight that apparently led to the stabbings, testified that the two men were hitting each other with their fists. She did not see any weapons. The transcript of defendant’s 9-1-1 call does not show that Hebert said anything to the dispatcher about Hughes possessing a weapon. Hebert mentioned that Hughes tried, unsuccessfully, to take his knife from him. In his police statement following arrest, Hebert said Hughes reached in his pocket while they were arguing, but that he did not produce a gun at the time of the stabbing.
Deputy Chauvet testified that when he spoke with Hebert at the scene, Hebert did not claim that Hughes had a weapon. While Hebert did sustain lacerations to his hands, he told police that he received the injuries in his confrontation with Craft, not from Hughes. Lieutenant Thurman testified that he did not find any gun or knife on the victim’s person. A paring knife was found several feet away from Hughes, and a potato peeler was near Hughes’ feet. However, Thurman testified that neither utensil had blood on it. He surmised that, *1122 because the utensils were clean, they were placed there after the stabbing. Hebert argues that the evidence established Hughes had a motive to attack him. Hebert speculates that Hughes knew he had an arrangement with Agent Renton to orchestrate an undercover drug buy with an eye to having Hughes arrested. There is nothing in the record to indicate that such was the case. In fact, defendant testified it was Philip Brinkle whom Hughes suspected of being a “narc.”
Hebert arguably had a strong motive for disposing of Hughes. Hebert testified that there came a point when he did not wish to be associated with Hughes any longer. Hebert was, however, unable to shake him. Moreover, Hughes was demanding he repay some drug money he owed him. Hebert’s plan was to get JjjHughes out of the way by having him arrested. It is possible he was frustrated by the fact that the undercover drug buy had been planned for weeks, but had not yet taken place. At trial, Hebert testified that he did not have any intention of killing Hughes; he just wanted Hughes in jail so that he would stay away from him. Hebert described the incident as a “dope deal going bad.” However, in his recorded statement, Hebert admitted, “I was meaning at the time, I was meaning to kill them.”
Hebert attempted to hide what he had done by having his wife clean up the evidence. He is heard on the 9-1-1 tape ordering his wife to do so. This is not the behavior of a man who knows his actions were justified because he acted in self-defense. Hebert’s actions imply guilty knowledge.
Dr. Garcia testified that it is human nature to protect oneself in the face of a physical attack, and to thereby sustain injuries to hands, forearms, and legs. The doctor did not, however, find that Hughes incurred any defensive wounds. Hebert argues that this supports his assertion that Hughes had a weapon at the time of the stabbing. We find this argument to have little merit. The more likely explanation for the lack of defensive wounds is that Hughes was simply so overcome by the sheer force of defendant’s attack that he was unable to even attempt to defend himself.
The evidence showed that Hebert’s attack on Hughes was brutal. Dr. Garcia testified that the lethal injury was the large wound to the chest. The blow damaged the victim’s heart and lungs. In order to reach those organs, a sharp object would have had to penetrate the sternum, which is fairly hard bone. That would have required a great deal of force and a sharp instrument. Hebert’s attack was unrelenting. Dr. Garcia testified that Hughes sustained a total of thirteen sharp force injuries to the back of his body, and ten to the front of his body. When one knife broke, Hebert retrieved a second and continued to stab Hughes. Meanwhile, J^Hebert testified, Hughes did not inflict any wounds on him. Nor did Hughes produce any solid blows to his face.
Defendant said in his police statement, “I figured it was my life or there [sic] life, I thought they was gonna kill me if I didn’t kill them.” However, there is little in the record, other than Hebert’s self-serving testimony, to show that he was justified in his belief that deadly force was necessary.
Hebert disputes the reliability of Craft’s- testimony, arguing that it should be given little weight in the sufficiency determination. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. Thus, a reviewing court may impinge upon the “ ‘fact finder’s discretion only to the extent *1123 necessary to guarantee the fundamental due process of law.’ ”[11]
Craft’s testimony was substantially supported by the evidence at trial. Craft testified that he did not have any weapon at the time of the stabbing. He further testified that he did nothing to threaten or provoke Hebert. While Hebert testified that Craft approached him, Craft testified that Hebert attacked him outside as he attempted to exit the car. Craft’s testimony is supported by the fact that blood was found on Hebert’s car.
Craft testified that when Hebert attacked him, he immediately attempted to escape. Craft’s testimony is supported by the fact that he sustained stab wounds in his back as he tried to flee. Hebert himself said in his police statement, ‘Yeah right he turned to get away from me and I stabbed him in the back.” Hebert acknowledged in his testimony that Craft ran from him, and that he pursued Craft in his car. Craft’s testimony regarding his flight from defendant and Hebert’s demeanor at the time of the stabbings was also borne out by the testimony of Lionel Fitzgerald, the driver who assisted Craft.
|1fiBased on the foregoing, we find that the state met its burden of proving that Hebert did not act in self-defense as to either of the victims.
As requested by defendant, the record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[12] and State v. Weiland.[13] The following matters are noted:
The trial judge imposed Hebert’s manslaughter sentence (count 1) without benefit of suspension of sentence. However, LSA-R.S. 14:31 does not require such a restriction. Hebert’s sentence is, therefore, illegal. LSA-C.Cr.P. art. 882(A) provides that “[a]n illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review.” It is within this Court’s authority to amend defendant’s sentence to remove the restriction on suspension of sentence.[14] We therefore amend the instant sentence to delete the words “without suspension of sentence.”
We further remand for correction of the minutes and commitment in this case to show that Hebert was found guilty by a jury. The commitment currently reflects that Hebert was found guilty by a judge.
Accordingly, for the foregoing reasons, the defendant’s conviction is affirmed, we amend defendant’s sentence, and we further remand to the trial court to correct error patent on the face of the record.
AFFIRMED, AMENDED, AND REMANDED.

. No written motions are found in the record.

. No written motion is found in the record.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The parties stipulated that, if chemist Daniel Waguespack were called as a witness, he would be accepted as an expert in the testing and identification of controlled dangerous substances, and that he would testify that the three rock-like objects recovered at the scene' tested positive for cocaine.

. The parties entered into a stipulation that on January 9, 2002, defendant contacted narcotics agent Jason Renton about working for him as a confidential informant; that on two occasions, defendant provided Renton with information regarding individuals other than Robert Hughes; and that defendant was paid for that information. The parties further stipulated that defendant spoke with Renton on January 25, 2002 about providing information regarding Hughes that would lead to a search warrant. (R., p. 518).

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 676, 61 L.Ed.2d 560 (1979); State v. Brown, 02-1922, p. 8 (La.5/20/03), 846 So.2d 715, 721.

. State v. Favorite, 03-425, p. 5 (La.App. 5 Cir. 11/25/03), 862 So.2d 208, 212, writ denied, 03-3529 (La.4/23/04), 870 So.2d 298.

. State v. Garcia, 483 So.2d 953, 956 (La.1986); State v. Favorite, 03-425 at p. 6, 862 *1121 So.2d at 212; State v. Johnson, 01-1362, p. 7 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 608, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32.

. State v. Favorite, supra.

. State v. Johnson, 01-1362 at p. 8, 820 So.2d at 608; State v. Sprinkle, 01-137, p. 16 (La.App. 5 Cir. 10/17/01), 801 So.2d 1131, 1141, writ denied, 01-3062 (La. 10/25/02), 827 So.2d 1174, cert. denied, 537 U.S. 1235, 123 S.Ct. 1358, 155 L.Ed.2d 200 (2003).

. State v. Legrand, 02-1462, p. 8 (La.12/3/02), 864 So.2d 89, 96 (quoting State v. Mussall, 523 So.2d 1305, 1310 (La.1988)).

. 312 So.2d 337 (La.1975);

. 556 So.2d 175 (La.App. 5 Cir. 1990).

. State v. Andino, 01-820, pp. 4-5 (La.App. 5 Cir. 1/15/02), 807 So.2d 944, 946.